# United States Tax Court

T.C. Memo. 2026-58

LINDA M. LEWIS, DONOR,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

PETER F. MCDOUGALL, DONOR,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 2459-22, 2460-22.                    Filed July 20, 2026.

————

Ps and their father, B, were beneficiaries of a trust (Residuary Trust) created under the will of C (B's wife and Ps' mother). B had an income interest in the trust; Ps had remainder interests. B also had a power to appoint trust assets, upon his death, to C's descendants. Ps and B agreed to terminate the Residuary Trust and also agreed to the distribution of all trust assets to B. In the absence of that agreement, under C's will, each beneficiary would have been entitled to a distribution of trust assets, upon the trust's termination, with a value equal to the value of the beneficiary's interest in the trust. In *McDougall v. Commissioner*, 163 T.C. 112 (2024), we concluded Ps made taxable gifts to B in allowing him to receive trust assets that would otherwise have been distributed to them. We left open, however, the question of the values of those gifts.

[*2]    Ps argue that each gift had only a nominal value because of B's limited power of appointment. Ps rely on the testimony of a valuation expert who, in determining B's life expectancy on the date the Residuary Trust terminated, treated B as having been five years younger than he actually was because of his high level of income.

R argues that the values of Ps' gifts should be determined under the tables prescribed under I.R.C. § 7520 to value remainder interests for federal tax purposes. R further argues that the value of Ps' gifts should not be reduced by the obligation Ps would have had under I.R.C. § 2207A to reimburse B for gift taxes he would have owed if Ps had received the distributions to which they would have been entitled under C's will. R concedes that, if the tables issued under I.R.C. § 7520 do not apply and Ps' gifts should be reduced by reason of I.R.C. § 2207A, then each gift had a value of no more than $35,141,321.

*Held*: Because the provisions of C's will must be interpreted to effect the intent expressed in her will, if Ps had agreed with B to terminate the Residuary Trust without specifying how the trust assets should be distributed, the distributions to which Ps would have been entitled would not have been reduced by reason of B's limited power of appointment.

*Held, further*, because Ps' receipt of the distributions to which they would have been entitled under C's will would have carried with it obligations to reimburse B for gift taxes under I.R.C. § 2207A(b), the gifts Ps made to B in allowing him to receive all the Residuary Trust assets should be reduced by Ps' avoided reimbursement obligation.

*Held, further*, the amounts to which Ps would have been entitled under C's will is a question of state law; consequently, the tables prescribed under I.R.C. § 7520 to value remainder interests for federal tax purposes do not determine the value of Ps' gifts to B.

*Held, further*, in valuing B's income interest in the Residuary Trust, and thus Ps' gifts to B, B's high income

[*3]   alone does not justify departing from standard actuarial tables to determine his life expectancy.

       *Held, further*, in light of the conclusions stated above and R's concession, the gifts Ps made to B had a value of $35,141,321 each.

————————

*John W. Porter*, *Keri D. Brown*, and *Tyler R. Murray*, for petitioners.

*Amy Chang*, *Hannah E. Linsenmayer*, *Randall L. Eager*, *William Benjamin McClendon*, and *Stephanie Lugo-Cervantes*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

      HALPERN, *Judge*:  In *McDougall v. Commissioner*, 163 T.C. 112 (2024), we concluded that petitioners made taxable gifts to their father, Bruce McDougall, when they agreed with him to terminate a trust created under the will of their mother, Clotilde McDougall, and allowed him to receive all the trust assets.  Given the procedural posture of the cases at that time (addressing Motions for Summary Judgment), our prior Opinion left open the question of the values of the gifts petitioners made to their father.  We now address that question.

FINDINGS OF FACT

*Clotilde's Will*

      Clotilde McDougall died in December 2011.  Under her will, Clotilde left the residue of her estate to a trust (Residuary Trust).  Clotilde's estate consisted primarily of her share of a real estate business that she had inherited from her father.  Clotilde's will provided for the distribution to her husband, Bruce, at least annually, of the Residuary Trust's net income.  It also allowed the trustee to distribute principal to Bruce, in the trustee's discretion, "to provide for [Bruce's] health, maintenance and support in his accustomed manner of living."  Bruce had a limited testamentary power to appoint the principal of the Residuary Trust to or among Clotilde's descendants.  Upon Bruce's death, to the extent that he did not exercise his power of appointment, the remainder of the Residuary Trust was to be "divided into equal shares, one share for each of [Clotilde's] children who is then living and

[*4] one share for each of [her] children who is then deceased with children then living."

Section 12.8 of Clotilde's will provided that, upon the termination of any trust created under the will, the trustee was to distribute the trust assets among its beneficiaries. The distributions did not have to be pro rata, "so long as the distributees receive assets of a value equal to the value of their respective interest in the trust at the time of distribution."

A "spendthrift clause" in Clotilde's will provided that "[n]o beneficiary shall have any power to give, grant, sell, convey, mortgage, pledge or otherwise dispose of, encumber or anticipate the principal, income, or increase of [the] trust estate, any portion thereof, or any installment thereof."

*QTIP Election*

Bruce, as personal representative of Clotilde's estate, made a qualified terminable interest property (QTIP) election with respect to the property that funded the Residuary Trust.

*Bruce's Will*

On June 21, 2016, Bruce executed a will that included a provision that, upon his death, would have exercised the power of appointment over the Residuary Trust assets granted to him under Clotilde's will. Bruce's will directed the trustee of the Residuary Trust, upon Bruce's death, "to distribute all remaining principal and any accrued or undistributed income" subject to his power of appointment to the Bruce McDougall Revocable Trust (Revocable Trust), which Bruce created on the same day that he executed the will. Under the terms of the Revocable Trust, upon Bruce's death, tangible personal property would be distributed as provided in a separate writing or allocated between Bruce's children. The remainder of the estate of the Revocable Trust, after expenses, would be allocated among Bruce's descendants.

*Termination of the Residuary Trust*

On October 31, 2016, petitioners, who resided in the State of Washington when they filed their Petitions, entered into an agreement with their father concerning the Residuary Trust assets (Nonjudicial Agreement). Section 2 of the Nonjudicial Agreement provides: "The parties hereby agree that the Trust shall be commuted and the entire

[*5] remaining balance of the Trust shall be distributed outright and free of trust to Bruce."[1]  The parties stipulated that the Residuary Trust assets had a value of $117,604,143 on October 31, 2016.

*Expert Testimony on Valuation*

*David Eckstein*

We accepted David Eckstein, who testified on petitioners' behalf, "as an expert in the field of business valuation, intangible asset valuation, and valuation of economic interest."  In his written report, Mr. Eckstein determined the fair market values of petitioners' and Bruce's interests in the Residuary Trust.  At the direction of counsel, Mr. Eckstein determined the values of the trust interests under three alternative scenarios.  Those scenarios differed in the extent to which they considered Bruce's various rights under the terms of Clotilde's will.  In his "Scenario I," Mr. Eckstein took into account Bruce's right to income from the Residuary Trust but not his power of appointment or his right to distributions for his health, maintenance, and support.  In "Scenario II," Mr. Eckstein considered Bruce's qualified right to principal but still disregarded Bruce's power of appointment.  Only in his "Scenario III" did Mr. Eckstein consider the impact of Bruce's power of appointment (along with Bruce's other rights) on the values of the remainder interests in the trust.  Mr. Eckstein determined that the discounted cashflow method was "[t]he most appropriate method by which to value the Remainder Interests."

In projecting future distributions from the Residuary Trust, Mr. Eckstein needed to consider how long Bruce would live.  He consulted the 2016 Social Security Administration Life Table to determine Bruce's life expectancy on October 31, 2016.  He acknowledged that that table "serves as a reasonable baseline for general population."  In his judgment, however, the Social Security table "does not reflect longer life expectancies associated with higher income."

On the basis of one or more discussions with Linda, Mr. Eckstein concluded that "Bruce is in good health for a person of his age."  Linda described Bruce as having been "mentally sharp" on October 31, 2016, even though he had "some physical difficulties with mobility due to osteoporosis."  Mr. Eckstein was aware of "no other . . . physical or

---

[1] The Nonjudicial Agreement thus made no provision for trust assets to be retained as a reserve for the payment of taxes.

[*6] mental conditions that would negatively affect [Bruce's] life expectancy."

Mr. Eckstein referred to research "indicat[ing] that healthy males categorized as high-earning individuals are likely to outlive the average male of average means." According to a study published in the Journal of the American Medical Association (JAMA), "a 40-year-old male in the top income percentile" had a "9-year greater life expectancy" compared to those with average incomes. Any life expectancy gap based on income, however, would "narrow[] . . . with age." At trial, Mr. Eckstein opined that the JAMA study gave him "very strong support to say that [the Social Security tables] underestimated [Bruce's] life expectancy." On the basis of Bruce's income and "above-average health," Mr. Eckstein concluded that "the life expectancy statistics for a typical 80-year-old" would be "a reasonable approximation for Bruce at age 85."[2]

In his initial report, Mr. Eckstein cited "discussion with Linda" as the basis for his evaluation of Bruce's health. At trial, he acknowledged that he did not interview Bruce or review Bruce's medical records from 2016. He also acknowledged that not all of Bruce's health indications were positive. In particular, he viewed Bruce's mobility issues as "a moderate negative factor." Mr. Eckstein admitted that he was not an actuary, and he did not discuss Bruce's life expectancy with an actuary.

In addition to Bruce's life expectancy, another key element of computing the present value of projected future distributions from the Residuary Trust was the determination of appropriate discount rates. Mr. Eckstein reasoned that those discount rates should reflect that petitioners would have had to wait longer than Bruce for distributions: Bruce was entitled to distributions of income at least annually while petitioners would not receive distributions (if at all) until Bruce's death.

Mr. Eckstein determined that that difference in the timing of distributions would be appropriately reflected by a spread of 150 basis points (1.5%) between the discount rates used to value petitioners' remainder interests and Bruce's term interest. In his initial report, Mr. Eckstein allocated that 150-basis-point spread evenly between the term and remainder interests. Because the remainder interests were much larger in value, a 75-basis-point increase to the discount rate used to

---

[2] Bruce reported adjusted gross income of about $2.2 million on his 2015 federal income tax return. Mr. Eckstein determined that, according to statistics reported by the Internal Revenue Service, Bruce's reported income put him well within the top 1% of all taxpayers.

**[\*7]** value those interests reduced their value by more than the increase in value from the 75-basis-point decrease to the discount rate used to value the term interest. That meant that, before any other factors were taken into account, the sum of the values Mr. Eckstein assigned to the different interests in the Residuary Trust in his Scenario I analysis was less than the stipulated value of the trust assets. Mr. Eckstein acknowledged at trial that he had erred in dividing evenly between the classes of interests the 150-basis-point spread he had determined to be appropriate to reflect the different durations of the interests.

At our request, Mr. Eckstein prepared a supplemental report that corrected his error in the allocation of his 150-basis-point spread. In his supplemental report, he initially valued the remainder interests at $53.21 million each, using a discount rate of 10.11%. He valued Bruce's term interest at $11.19 million, using a discount rate of 8.61%. (Mr. Eckstein's initially determined values for the trust interests thus summed to $117.6 million, equal to the stipulated value of the trust assets.)

Then, however, Mr. Eckstein concluded that the discount rate used to value the remainder interests should be increased by an additional 400 to 600 basis points because those interests were not marketable and petitioners, as the holders of those interests, did not control the trust assets. The increased discount rate for lack of marketability and lack of control reduced the value of the remainder interests from $53.21 million each to $37.48 million each. As a consequence, Mr. Eckstein's initially determined Scenario I values for the term and remainder interests in the trust summed to only $86 million—$37.6 million less than the stipulated value of the Residuary Trust assets. Mr. Eckstein then allocated that $37.6 million shortfall among the trust interests in proportion to their initially determined values.[3] That allocation increased the value of the remainder interests from $37.48 million each to $51.3 million each. As Mr. Eckstein acknowledged at trial, his proration among the interests of the value discrepancy created by his discounts for lack of marketability and lack of control had the effect of undoing those discounts.

---

[3] At trial, Mr. Eckstein testified: "I couldn't think of any other way that somebody would do this other than proportionately." When asked whether it might have been more consistent with Clotilde's wishes for the excess value to be allocated to Linda and Peter so that the trust assets would "stay within the family," Mr. Eckstein acknowledged that that would be "a legal issue, not a valuation issue."

[*8]    Mr. Eckstein assumed, perhaps on the basis of instructions from counsel, that Bruce's various rights included a right to be reimbursed for gift or estate taxes.  Therefore, apparently assuming a transfer tax rate of 40%, Mr. Eckstein divided his $51.3 million "Pre-Reimbursement Right Allocation" by 1.4, to arrive at a "Post-Reimbursement Right Allocation" for each remainder interest of $36.6 million.

In his Scenario II, rather than project future distributions of trust principal to Bruce as necessary for his health, maintenance, and support, Mr. Eckstein further increased the discount rate he used to value the remainder interests.  That increased discount rate reduced the initial value Mr. Eckstein assigned to the remainder interests from $37.48 million to $29.4 million.  Mr. Eckstein's increased Scenario II discount rate for the remainder interests was akin to assuming that Bruce would require distributions of principal from the Residuary Trust with a present value, as of October 31, 2016, of about $16.2 million (($37.48 million − $29.4 million) × 2).

Mr. Eckstein's initial Scenario II values summed to only $71 million—$46.6 million less than the $117.6 million stipulated value of the trust assets.  After allocating that discrepancy ratably among the interests, Mr. Eckstein arrived at a Pre-Reimbursement Right Allocation in Scenario II of $48.8 million for each remainder interest. Mr. Eckstein's Scenario II Post-Reimbursement Right Allocation for each remainder interest was $34.9 million ($48.8 million ÷ 1.4).

At our request, Mr. Eckstein included in his supplemental report alternative calculations made on the assumption that Bruce's life expectancy should be determined on the basis of his actual age on October 31, 2016.  Mr. Eckstein's alternative Scenario II calculations valued each remainder interest at $37.4 million.

In Scenario III, Mr. Eckstein determined that, because of Bruce's power of appointment, the holders of the remainder interests had only a "remote probability of receiving any cash flow."  Consequently, in his Scenario III, Mr. Eckstein valued each remainder interest at only $156,000.

*David Fuller*

We accepted David Fuller, who testified on respondent's behalf, as an expert in business valuation and the valuation of intangible assets.  Mr. Fuller derived the fair market value of the remainder interests in the Residuary Trust "by determining the value of the income

**[*9]** interest and subtracting that from the [trust's] net asset value." He chose that method because it "utilize[d] fewer assumptions and relied specifically on the certainty of the annual distributions, rather than growing the assets of the Residuary Trust at an unknown rate and discounting those future values to present value."

Mr. Fuller projected future distributions to Bruce on the basis of distributions Bruce received from the Residuary Trust in 2015 and 2016. In his baseline calculation, Mr. Fuller computed average prior distributions by including amounts that Bruce gifted to Linda and Peter. Under that approach, Mr. Fuller arrived at a value for the remainder interests of $98,395,700 in the aggregate, or $49,197,850 each.

In an alternative calculation, Mr. Fuller excluded the gifted amounts from the average prior distributions that he used to project future distributions. The reduction in projected future distributions reduced the value of Bruce's income interest and increased the value of the remainder interests. In his alternative calculation, Mr. Fuller valued the remainder interests at $103,587,100 in the aggregate, or $51,793,550 each.

## OPINION

I.  *Applicable Law*

Section 2501(a)(1) imposes a tax "on the transfer of property by gift . . . by any individual, resident or nonresident."[4] As a general rule, the tax applies regardless of the nature of either the transfer (whether "in trust or otherwise" and whether "direct or indirect") or the transferred property (whether "real or personal, tangible or intangible"). § 2511. Section 2512(a) provides: "If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift."

Section 2001(a) imposes a tax "on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States." A decedent's "taxable estate" is his "gross estate" less specified deductions. § 2051. His gross estate "include[s] the value of all property

---

[4] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect for 2016, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect for that year, and Rule references are to the Tax Court Rules of Practice and Procedure in effect at the relevant times.

**[\*10]** to the extent of the interest therein of the decedent at the time of his death." § 2033.

One of the most important deductions allowed in computing the taxable estate of a married decedent is the deduction allowed by section 2056(a), which applies to "any interest in property which passes or has passed from the decedent to his surviving spouse." In its current form, the marital deduction reflects Congress's belief "that a husband and wife should be treated as one economic unit for purposes of estate and gift taxes, as they generally are for income tax purposes." S. Rep. No. 97-144, at 127 (1981), *reprinted in* 1981 U.S.C.C.A.N. 105, 228.

The marital deduction is generally not allowed, however, for terminable interests that pass from a decedent spouse to her surviving spouse. *See* § 2056(b). As the Supreme Court explained in *United States v. Stapf*, 375 U.S. 118, 128 (1964), "[t]he purpose [of the marital deduction] is only to permit a married couple's property to be taxed in two stages and not to allow a tax-exempt transfer of wealth into succeeding generations." Therefore, "the marital deduction is generally restricted to the transfer of property interests that will be includible in the surviving spouse's gross estate." *Id.* A terminable interest in property passing from a predeceasing spouse to her surviving spouse may not be includible in the surviving spouse's estate. For example, a right to income from property for the remainder of the surviving spouse's life will terminate upon the surviving spouse's death. For that reason, the marital deduction is generally not allowed for terminable interests.

The rules in effect before 1981 required a spouse to choose between a marital deduction and retention of control over the disposition of his property. "Because the surviving spouse had to be given control over the property [to obtain a marital deduction]," the Staff of the Joint Committee on Taxation explained, "the decedent could not insure that the spouse would subsequently pass the property to his children." Staff of J. Comm. on Tax'n, 97th Cong., General Explanation of the Economic Recovery Tax Act of 1981, JCS-71-81, at 233 (J. Comm. Print 1981). Thus, "a decedent would be forced to choose between surrendering control of the entire estate to avoid imposition of estate tax at his death or reducing tax benefits at death to insure inheritance by his legatees." *Id.* at 233–34.

Congress determined that spouses should not be put to that choice. As the Joint Committee staff wrote: "The Congress believed that

**[*11]** the transfer tax consequences should not unduly influence how an individual disposes of his property." *Id.* at 234.

Therefore, as part of the Economic Recovery Tax Act of 1981, Pub. L. No. 97-34, 95 Stat. 172, 302, Congress enacted section 2056(b)(7), which allows QTIP to qualify for the marital deduction under section 2056(a). The term "qualifying terminable interest property" refers to property (1) that passes from a predeceasing to a surviving spouse, (2) "in which the surviving spouse has a qualifying income interest for life," and (3) in respect of which an election is made under section 2056(b)(7). Under section 2056(b)(7)(A), QTIP is treated as having passed in its entirety from the predeceasing spouse to the surviving spouse. The predeceasing spouse's estate is thus entitled to a marital deduction for the property's full value and is not subject to estate tax on the transfer of the remainder interest in the property. Consistent with that treatment, the QTIP is then generally included in the surviving spouse's estate under section 2044(a), even though the surviving spouse has no interest in the property that can be transferred upon his death.

By its terms, section 2044(a) applies only to property "in which the decedent [that is, the surviving spouse] had a qualifying income interest for life." The surviving spouse's disposition of his qualifying income interest for life would thus negate the application of section 2044(a) and potentially allow the property to escape transfer tax. Therefore, if a surviving spouse holds a qualifying income interest for life in QTIP and makes a "disposition" of that interest, the surviving spouse is treated as having "transfer[red] . . . all interests in [the QTIP] other than the qualifying income interest." § 2519(a).[5]

Under the QTIP rules, the surviving spouse or his or her estate may be subject to gift or estate taxes on transfers that do not actually occur. Section 2207A allows the burden of those taxes to be borne by those who actually own the property in question. Under that section, a surviving spouse or his or her estate can recover from the recipients of the QTIP any gift or estate tax paid by reason of section 2519 or 2044. A surviving spouse's entitlement to recover gift tax on a section 2519 disposition reduces the amount of the gift. Treas. Reg. § 25.2519-1(c)(4). Thus, the amount of the gift and the resulting tax are determined "using

---

[5] Section 2519(a) need not create a deemed transfer of the surviving spouse's income interest because the statute is triggered by the surviving spouse's *actual* disposition of the income interest. Taken together, the actual disposition and deemed transfer created by section 2519(a) cover the entire QTIP.

**[\*12]** the same interrelated computation" used for net gifts, in which the donee assumes the gift tax liability.  *Id.*[6]

Section 7520 requires that, for purposes of the Code, the value of specified property interests, including remainder interests, must be determined "under tables prescribed by the Secretary."  In valuing the specified interests, the prescribed tables must "us[e] an interest rate (rounded to the nearest $\frac{2}{10}$ths of 1 percent) equal to 120 percent of the Federal midterm rate in effect under section 1274(d)(1) for the month in which the valuation date falls."  § 7520(a)(2).

The tables issued under section 7520 provide standard present value factors for remainder interests, at different interest rates, using the age of the life beneficiary.  For October 2016, the section 7520 interest rate was 1.6%.  Rev. Rul. 2016-25, 2016-41 I.R.B. 435, 436.

The standard actuarial factors provided in the section 7520 tables generally may not be used to value a remainder interest that is a "restricted beneficial interest."  Treas. Reg. § 25.7520-3(b)(1)(ii).  A remainder interest is a restricted beneficial interest if it "is subject to any contingency, power, or other restriction, whether the restriction is provided for by the terms of the trust, will, or other governing instrument or is caused by other circumstances."  *Id.*

II.  *Prior Opinion and Order*

In *McDougall*, we addressed competing Motions for Summary Judgment concerning the gift tax consequences of the termination of the Residuary Trust.  Respondent argued that the transaction resulted in taxable gifts (1) by Bruce to Linda and Peter and (2) by Linda and Peter to Bruce.  Petitioners and their father contended that the transaction resulted in no taxable gifts.  We granted each Motion in part and denied it in part.  In particular, "we conclude[d] that Bruce . . . made no gifts, but that Linda and Peter . . . did."  *McDougall*, 163 T.C. at 114.

Bruce's receipt of all the property of the Residuary Trust was critical to our conclusion that the trust's termination did not result in

---

[6] The net gift can be determined by dividing the value of the transferred property by the sum of one plus the gift tax rate.  Thus, for example, if the transferred property is worth $100 and the applicable gift tax rate is 40%, the net gift would be $71.43 ($100 ÷ 1.4) and the tax on that gift would be $28.57 ($71.43 × .4).  The gift and the tax on the gift thus sum to the value of the transferred property ($71.43 + $28.57 = $100).

**[\*13]** taxable gifts by Bruce to Linda and Peter. Like the surviving spouse in *Estate of Anenberg v. Commissioner*, 162 T.C. 199 (2024), Bruce ended up owning outright the property he was deemed by the QTIP rules to have owned before the trust's termination. Therefore, he cannot have given anything away in any deemed transfer resulting from the application of section 2519.

By contrast, "Linda and Peter plainly made gratuitous transfers." *McDougall*, 163 T.C. at 122. "Before the implementation of the Nonjudicial Agreement," we noted, Linda and Peter "held valuable rights, i.e., the remainder interests in the QTIP." *Id.* at 122–23. In consenting to the Nonjudicial Agreement and the transfer of all trust assets to Bruce, Linda and Peter gave up those valuable rights. "And they received nothing in return." *Id.* at 123. "By giving up something for nothing," we concluded, "Linda and Peter engaged in quintessential gratuitous transfers and are therefore subject to gift tax under sections 2501 and 2511." *Id.* Even though we accepted that Linda and Peter gave up "valuable rights," and thus made taxable gifts, "[g]iven the procedural posture of the case" at the time of our prior Opinion, we did not have occasion to "decide . . . the value of the gifts Linda and Peter made to Bruce." *Id.* at 123 n.7.

After we issued our prior Opinion in these cases, respondent moved for partial summary judgment concerning the nature of the property that Linda and Peter transferred by gift. In granting that Motion in part and denying it in part, we concluded, in an Order issued April 25, 2025 (April 25 Order), that "[t]he 'valuable rights' [Linda and Peter] gave up were the rights they would have had under section 12.8 of Clotilde's will had they not agreed in section 2 of the Nonjudicial Agreement that all trust property would be distributed to Bruce." Therefore, "the value of the gifts Linda and Peter made to Bruce equaled the value of the distribution to which they would have been entitled under section 12.8 of Clotilde's will upon the termination of the Residuary Trust had they not agreed in section 2 of the Nonjudicial Agreement that all trust property be distributed to Bruce."

III. *The Value of Petitioners' Gifts*

After our prior Opinion in these cases, the only issue remaining for trial was the value of the gifts we had concluded that petitioners made to their father. In their posttrial briefs, the parties ascribe vastly different values to the gifts petitioners made to Bruce. Respondent claims that Linda and Peter each made a gift to Bruce of $53,408,746.

**[\*14]** Petitioners deny that they made gifts at all but contend that, if they did, each gift had a value of only $156,000.

Almost all of the difference between the parties is attributable to three issues: (1) whether the value of the gifts petitioners made to their father should be reduced by reason of Bruce's limited power of appointment, (2) whether those gifts should be reduced by reason of section 2207A, and (3) whether the value of the gifts should be determined by the tables prescribed under section 7520. As explained below, resolution of those three issues leaves the parties only $241,321 apart. And we can close that remaining gap by addressing a fourth, less significant, issue: whether Bruce's life expectancy should be determined on the basis of his actual age on October 31, 2016, or by treating him as though he were five years younger.

A.   *Bruce's Testamentary Limited Power of Appointment*

Respondent argues that, by reason of the Spendthrift Clause in Clotilde's Will, Linda and Peter could not have made gifts to Bruce until the Residuary Trust terminated. And the termination of the trust eliminated Bruce's limited power of appointment. Therefore, respondent reasons, the limited power of appointment had no bearing on the value of the gifts. Petitioners, on the other hand, ground their position in the notion that a hypothetical purchaser of the remainder interests would have severely discounted the price to be paid for the interests because the purchaser would end up with nothing upon Bruce's death unless Bruce made a new will that did not exercise his limited power of appointment.

We are unpersuaded by either argument. We agree with respondent that Bruce's limited power of appointment should not reduce the value of petitioners' gifts but not for the reason respondent advances.

Petitioners made gifts to their father in allowing him to receive, upon the termination of the Residuary Trust, whatever trust assets would otherwise have gone to them. If petitioners and their father had agreed to terminate the Residuary Trust without specifying a distribution of assets, section 12.8 of Clotilde's will would have governed that distribution. Each beneficiary would have been entitled to a distribution of trust assets with a value equal to the value of the beneficiary's interest in the trust. Therefore, as we concluded in the April 25 Order, the value of the gifts petitioners made to their father is the value of the distributions to which they would have been entitled

**[\*15]** under section 12.8 of Clotilde's will had they not agreed to allow Bruce to receive all the trust assets upon its termination.

We therefore ask: If petitioners and their father had agreed to terminate the Residuary Trust without specifying a distribution of assets, how would the trustee, following section 12.8 of Clotilde's will, have divided the trust assets among the beneficiaries? Section 12.8 would have entitled each beneficiary to a distribution of assets with a value equal to the beneficiary's interest in the trust. So the trustee would have had to value the different interests in the trust. The parties apparently agree that, in valuing each interest, the trustee would have considered the present value of the expected future distributions that would have been made to each beneficiary if the trust had not terminated. Both Mr. Eckstein and Mr. Fuller explicitly employed a discounted cashflow analysis to value the trust interests. In his primary position, respondent claims that the trust interests should be valued using the section 7520 tables. Those tables implicitly apply a discounted cashflow analysis.[7]

Determining the value of the income and remainder interests in the Residuary Trust on the basis of a discounted cashflow analysis requires consideration of the future distributions that *would have* been made to the beneficiaries if, instead of terminating, the trust had remained in existence. Bruce's limited power of appointment could well have affected the future distributions made to petitioners. (Indeed, it might have deprived them of any distributions at all as remainder beneficiaries.) Therefore, the limited power of appointment cannot be summarily disregarded simply because it was extinguished by the trust's termination. Respondent accepts that the value of Bruce's income interest reflects the value of the expected future distributions of trust income he would have received had the trust not terminated. But the termination of the trust meant that those projected distributions would never occur.[8] Valuing the trust interests, and thus determining

---

[7] Using the section 7520 tables, respondent assigns an aggregate value to the remainder interests in the Residuary Trust of $106,817,492 ($53,408,746 × 2). That amount (with rounding) is the present value of receiving $117,604,143 (the stipulated value of the trust assets) in 6.06 years (the life expectancy assumed by the tables for an 85-year-old), discounted at 1.6% (120% of the federal midterm rate for October 2016). Respondent implicitly values Bruce's income interest at $10,786,651 ($117,604,143 − $106,817,492), which equals (again, with rounding) the present value of an annuity of $1,881,666 ($117,604,143 × .016) for 6.06 years, discounted at 1.6%.

[8] That is, because of the trust's termination, Bruce was not going to receive $1,881,666 per year for 6.06 years.

**[\*16]** the division of trust assets under section 12.8 of Clotilde's will, would have required consideration of events that, because of the trust's termination, would never happen.

If the trustee applying section 12.8 of Clotilde's will were to begin by determining the discounted present value of expected future distributions to the beneficiaries, the trustee would have quickly faced a problem. Because of Bruce's limited power of appointment, the aggregate value of the trust interests could not have equaled the value of the trust assets. Under the will Bruce executed on June 21, 2016, the assets of the Residuary Trust upon Bruce's death would have gone not to Linda and Peter, as the remainder beneficiaries of the Residuary Trust, but instead to Bruce's Revocable Trust. But Bruce's Revocable Trust was not a beneficiary of the Residuary Trust. The present value of the expected distribution to the Revocable Trust would not be included in the value of either the income interest or the remainder interests in the Residuary Trust.

How would the trustee of the Residuary Trust have made the numbers add up? How, in particular, would the trustee have allocated among the trust's actual beneficiaries (petitioners and their father) the value of the expected future distribution to Bruce's Revocable Trust?

Petitioners tell us that, if the values of the trust interests do "not sum to the stipulated value of the assets of the Residuary Trust, the parties must next calculate the ratio that the fair market value of each party's interest bears to the assets, as a whole, to determine the value of their respective interests in the Residuary Trust under § 12.8 of Clotilde's Will." Petitioners cite no authority for why their approach "must" be followed.[9]

The question of how the Residuary Trust assets would have been allocated under section 12.8 involves the interpretation of Clotilde's will. Under Washington state law, a court's "paramount duty in construing wills is to give effect to the testator's intent." *Schreiner v. Riemcke* (*In re Estate of Riemcke*), 497 P.2d 1319, 1323 (Wash. 1972).

Petitioners would have us accept that, if they and their father had agreed to terminate the Residuary Trust without specifying a distribution of assets, section 12.8 of Clotilde's will would have required

---

[9] Petitioners endorse the arithmetic approach taken by Mr. Eckstein, but Mr. Eckstein acknowledged that the propriety of his approach might involve a legal issue on which he was not qualified to opine.

[*17] the trustee to distribute to Bruce all but $312,000 of the trust's $117,604,143 of assets. The amount distributed to Bruce would have far exceeded the fair market value of his interest in the trust, measured by the present value of the expected distributions he would have received if the trust had not terminated. More importantly, that result would have been manifestly contrary to the intent reflected in Clotilde's will. As respondent observes, "had Clotilde wanted to leave all her assets to Bruce she could easily have done so by bequeathing all her property to him free of trust, and her estate could still have utilized the marital deduction to defer transfer taxes until Bruce's death." Instead, she left the residue of her estate to the Residuary Trust, giving Bruce only an income interest, a limited right to principal, and a limited power to appoint trust assets upon his death to Clotilde's descendants. Her will thus reflects a preference that Bruce not have outright ownership of her share of her father's business.

We therefore conclude that, if petitioners and their father had agreed to terminate the Residuary Trust on October 31, 2016, without specifying a division of assets, the trustee, in valuing the beneficiaries' interests in the trust under section 12.8 of Clotilde's will, would have assumed that, if the trust were not being terminated, the trust assets, upon Bruce's death, would have been distributed in equal shares to petitioners. In our judgment, the resulting distribution of assets would, if challenged, have been upheld by a Washington state court guided by the intent expressed in Clotilde's will. We find Mr. Eckstein's Scenario III analysis unhelpful because it implicitly rests on a view of Washington state law that we regard as incorrect. It follows, on the basis of Mr. Eckstein's Scenario II analysis, which disregarded Bruce's limited power of appointment, that the gifts Linda and Peter made to Bruce had a value of at least $34.9 million each.[10] Our resolution of the issue of the effect of Bruce's limited power of appointment on the value of the gifts thus narrows the difference between the parties from $53,252,746 ($53,408,746 − $156,000) to $18,508,746 ($53,408,746 − $34,900,000).

B.    *Section 2207A*

The next most significant issue dividing the parties is the impact of section 2207A. As noted above (and in the April 25 Order), our

_____

[10] If Bruce's life expectancy were determined on the basis of his actual age on October 31, 2016, rather than treating him as having been five years younger, Mr. Eckstein, in his Scenario II analysis, would have valued the gifts that Linda and Peter made to Bruce at $37.4 million each.

**[*18]** lodestar in valuing the gifts petitioners made to their father in allowing him to receive all the assets of the Residuary Trust upon its termination is what would have happened if the parties had agreed to terminate the trust *without* specifying a distribution of assets. That comparison allows us to measure what petitioners gave up in allowing their father to receive all the trust assets.

If the beneficiaries of the Residuary Trust had agreed to terminate the trust without specifying a distribution of trust assets, petitioners would have been entitled, under section 12.8 of Clotilde's will, to distributions of trust assets with a value equal to the value of their remainder interests in the trust. If petitioners had received distributions of trust assets with values commensurate with their interests in the trust, the termination of the trust would have effected a "disposition," within the meaning of section 2519, of Bruce's qualifying income interest in the trust property. Bruce would have been treated as having transferred all the interests in the trust property other than his qualifying income interest for life. And that deemed transfer would have been a taxable gift.

If petitioners had received property from the Residuary Trust with a value equal to their interests in the trust, the reason why we found in *McDougall* that Bruce did not make taxable gifts would not apply. As noted, it was critical to our prior Opinion that all the trust assets were distributed to Bruce. Had that not been the case—that is, if Bruce had *not* ended up owning all the property he had been deemed to own before the trust terminated—his deemed transfer of all the trust property other than that attributable to his qualifying income interest would have been gratuitous. Bruce would have owed gift tax on that gratuitous transfer, and he would have been entitled under section 2207A to recover that gift tax from petitioners. Under Treasury Regulation § 25.2519-1(c)(4), Bruce's taxable gift would have been net of the gift tax he was entitled to recover.

Using respondent's section 7520 numbers solely for purpose of illustration, if Linda and Peter had each received $53,408,746 upon the termination of the Residuary Trust, that receipt would have given rise to a liability to Bruce of $15,259,642 (assuming a gift tax rate of 40%).[11]

---

[11] The parties agree that, because of prior inter vivos gifts, any gifts Bruce made in 2016 would have been subject to tax at 40%, the highest marginal rate prescribed by section 2001(c). At that rate, Bruce's net gift would have been $38,149,104 ($53,408,746 ÷ 1.4), and the tax on the net gift would have been $15,259,642 ($38,149,104 × .4).

**[\*19]** If they had not agreed to allow Bruce to receive all the trust assets, Linda and Peter would each have ended up with only $38,149,104 ($53,408,746 – $15,259,642)—not the full $53,408,746. That net amount is what each petitioner gave up in allowing Bruce to receive all the trust assets instead of insisting on his or her receipt of (by hypothesis) $53,408,746 under section 12.8 of Clotilde's will.

Respondent agrees that, "had the trust beneficiaries prematurely terminated the Residuary Trust and each beneficiary (in actuality) received their terminating distributions pursuant to Clotilde's Will, Bruce would be subject to gift tax associated with a § 2519 disposition and entitled to recover that tax (once paid) from Linda and Peter under § 2207A." We have already concluded that petitioners' gifts should be measured by comparing what actually happened to what *would have* happened if they had received the distributions to which they would have been entitled under section 12.8 of Clotilde's will. Again, that comparison allows us to measure what petitioners gave up in allowing their father to receive all the trust assets. And respondent agrees that, if petitioners had received the distributions to which they would have been entitled under Clotilde's will, those distributions would have carried with them obligations to reimburse Bruce for gift tax under section 2207A(b). What Linda and Peter each gave up, therefore, is the distribution he or she would have received net of the avoided liability to reimburse Bruce for gift tax.

While respondent acknowledges that Linda's and Peter's gifts *might* be reduced by reason of section 2207A, his primary position is that that section does not require any reduction in the taxable gifts. He argues that "[a] hypothetical gift tax liability under § 2519 is too speculative to impact the valuation of Linda's and Peter's remainder interests." He notes that, when petitioners and their father agreed to terminate the trust, they did not leave assets in the trust as a reserve to cover Bruce's gift tax liability.

Respondent's arguments miss the mark. The likelihood that section 2207A would have come into play as a result of the transaction the parties actually carried out is irrelevant in measuring petitioners' gifts. Again, those gifts are measured by what petitioners gave up in agreeing that all the Residuary Trust assets would be distributed to their father. We thus have to consider what petitioners would have received if they had not agreed to allow Bruce to receive all the trust assets. And what they would have received was the amount to which

**[\*20]** they were entitled under section 12.8 of Clotilde's will net of the obligation they would have had to Bruce under section 2207A.

As respondent points out, a donee's liability to a donor under section 2207A does not arise until the gift tax is paid. Here, however, we are considering a hypothetical transaction. We have already concluded that Bruce owes no gift tax as a result of the transaction the parties actually carried out. But we have also concluded that petitioners made gifts to Bruce. And we have concluded that their gifts should be valued by reference to what they gave up in allowing Bruce to receive all the Residuary Trust assets. We thus consider what would have happened if petitioners had received the distributions to which they would have been entitled under section 12.8 of Clotilde's will. If petitioners had received *those* distributions, Bruce *would* have owed gift tax and he would have been entitled to recover the tax from petitioners. Under the circumstances, it is appropriate to assume that Bruce would have paid the gift tax owed, giving rise to the right of reimbursement that would have reduced the value that petitioners gave up in allowing their father to receive all the trust assets.

Respondent concedes that, if petitioners' gifts to Bruce were reduced by the obligation to him that they would have had under section 2207A if they had received the distributions of trust assets to which they would have been entitled under Clotilde's will, then each gift was worth no more than $38,149,104. Our resolution of the first two issues thus leaves the parties $3,249,104 apart ($38,149,104 − $34,900,000[12]).

C.    *Section 7520*

Almost all of the remaining difference between the parties is attributable to the applicability (or not) of the tables prescribed under section 7520 in valuing petitioners' gifts to Bruce. Respondent argues that the Nonjudicial Agreement, in eliminating Bruce's limited power of appointment, "transformed" the remainder interests in the Residuary Trust "into the prototypical property interest that can (and must) be valued under section 7520." Petitioners counter that *because of* Bruce's limited power of appointment (and other contingencies), the interests that they held were restricted beneficial interests that cannot be valued using the section 7520 tables.

---

[12] Again, $34,900,000 is Mr. Eckstein's Scenario II value, determined by treating Bruce as if he had been only 80 years old on October 31, 2016.

**[\*21]** Once again, we are not persuaded by either side's argument. We agree with petitioners that the section 7520 tables do not apply but not for the reason they advance.

In our judgment, the section 7520 tables would not apply to determine the value of petitioners' gifts without regard to whether the interests they held in the Residuary Trust were restricted beneficial interests. The question of the beneficiaries' entitlements to the Residuary Trust assets upon the trust's termination is a question of state law. It is axiomatic that state law determines property rights and federal tax law then determines how those rights are taxed. *See, e.g., Morgan v. Commissioner*, 309 U.S. 78, 80 (1940). Thus, "[g]rantees under deeds, wills and trusts . . . take according to the rule of the state law." *Helvering v. Stuart*, 317 U.S. 154, 161 (1942). "The power to transfer or distribute assets of a trust is essentially a matter of local law." *Id.*

Both parties recognize the principle articulated in *Morgan* (and applied in *Stuart*). Respondent, however, fails to appreciate the significance of that principle in determining the relevance of the section 7520 tables to these cases.

Respondent claims support for his position from "the plain language of section 7520." He reminds us that the statute provides that "the value of any . . . remainder . . . interest *shall be* determined" under the prescribed tables. But respondent quotes the statute selectively. He omits the first five words of the text: "For purposes of this title." A trustee determining how to divide the assets of the Residuary Trust under section 12.8 of Clotilde's will upon the trust's termination would not be making that determination, in the first instance, for purposes of the Code. Instead, the trustee would be determining the beneficiaries' entitlements to the trust property—a matter of state law.

A trustee might look to the section 7520 tables for guidance, but we do not agree that those tables would be determinative. Suppose, for example, that the trustee determined that Linda and Peter were entitled to $49,197,850 each upon the termination of the Residuary Trust (the value determined by Mr. Fuller). And suppose they challenged that allocation, claiming that, under the section 7520 tables, they were entitled to $53,408,746. Would they prevail before a Washington state court in their claim that, *as a matter of law*, the section 7520 tables determined the distributions to which they were entitled? We think not.

**[\*22]** We have concluded that petitioners' gifts were reduced by the obligation they would have had under section 2207A to reimburse Bruce for gift tax had they received the distributions to which they would have been entitled under section 12.8 of Clotilde's will. We have also concluded that the amounts of those distributions would not have been determined by the section 7520 tables. Respondent concedes that, in those circumstances, each petitioner's gift had a value of no more than $35,141,321 ($49,197,850 ÷ 1.4). That amount is only $241,321 higher than Mr. Eckstein's Scenario II value, treating Bruce as if he had been only 80 years old on October 31, 2016 ($35,141,321 − $34,900,000 = $241,321). And Mr. Eckstein has advised us that, if he had determined Bruce's life expectancy on the basis of his actual age on that date, Mr. Eckstein's Scenario II value would have been $37,400,000—even *higher* than the value respondent would assign to the gifts taking into account section 2207A but not applying the section 7520 tables. Therefore, we now turn to the question of whether it was appropriate for Mr. Eckstein to determine Bruce's life expectancy by treating him as having been five years younger than he actually was.

D. *Bruce's Life Expectancy*

Respondent contends that the record is "devoid of medical expert testimony or medical records or any other evidence that would support any expert using an age other than Bruce's actual age." Petitioners acknowledge that "none of the experts had access to Bruce's medical records." Petitioners contend, however, that "nothing in the record demonstrates that [Bruce's medical] records would have caused Mr. Eckstein to reach a different conclusion." They argue that Mr. Eckstein "exercised his professional judgment in making his determination regarding the appropriate life expectancy in the Social Security Actuarial Life Tables to use."

We are unpersuaded that, for the purpose of valuing Bruce's income interest in the Residuary Trust to determine the distribution to which he would have been entitled under section 12.8 of Clotilde's will upon the termination of the trust on October 31, 2016, Bruce would have appropriately been treated as five years younger than he actually was. Life expectancy tables, such as those issued by the Social Security Administration, rely on the law of large numbers. The standard tables will inevitably understate the life expectancy of some individuals and overstate that of others. But if the tables are based on an adequate sample size, the inaccuracies in each direction will balance out. The tables will thus provide a reasonable estimate for individuals of a given

**[\*23]** age.  Adjusting the estimates provided by the tables to take into account some, but not all, factors unique to a particular individual would introduce bias and, in our judgment, would be methodologically questionable.  Bruce's income was but one of myriad factors relevant in determining his life expectancy.  All else being equal, that one factor might have caused the standard Social Security tables to understate Bruce's life expectancy.  Without considering *all* factors relevant to Bruce's life expectancy, however, Mr. Eckstein could not conclude that all else was equal.

We find no indication in the record that Mr. Eckstein conducted an adequate study of the factors relevant in predicting Bruce's life expectancy.  Mr. Eckstein was unaware of physical or mental conditions Bruce might have had, other than his osteoporosis and mobility issues, that would have reduced his life expectancy.  It does not follow, however, that Bruce did not have any such physical or mental conditions.  Mr. Eckstein did not even interview Bruce, much less review Bruce's medical records.  That the record does not disclose factors that might have caused Mr. Eckstein to revise his opinion does not establish that no such factors existed.  An investigation limited to talking with Linda did not necessarily provide Mr. Eckstein with all information regarding Bruce's health relevant in predicting his life expectancy.  Moreover, Mr. Eckstein's expertise is in valuation.  He is not an actuary and did not consult an actuary in determining Bruce's life expectancy.  Therefore, contrary to petitioners' argument, predicting Bruce's life expectancy was not a matter within Mr. Eckstein's "professional judgment."

We conclude that, in valuing Bruce's interest in the Residuary Trust for the purpose of implementing section 12.8 of Clotilde's will, Bruce's life expectancy, as of October 31, 2016, would have been properly determined on the basis of his actual age rather than by treating him as though he were five years younger.  Therefore, the calculations Mr. Eckstein provided us in his supplemental report indicate (given our conclusion about the impact of Bruce's limited power of appointment) that the gifts Linda and Peter made to Bruce had a value of at least $37,400,000 each.

Respondent has conceded that the gift Linda and Peter each made to Bruce had a value of no more than $35,141,321 if, as we have concluded, (1) petitioners' gifts to their father should be reduced by the obligations they would have had under section 2207A to reimburse Bruce for the gift tax he would have owed if the Residuary Trust had terminated under section 12.8 of Clotilde's will, and (2) the tables

**[\*24]** prescribed under section 7520 do not determine the value of petitioners' gifts. Mr. Eckstein's analysis indicates that, given the conclusions we have reached, each petitioner's gift might have been worth more than $35,141,321, even leaving aside questions about the impact (if any) of Bruce's qualified right to distributions of trust principal and the appropriateness of discounts for lack of control and lack of marketability in valuing petitioners' remainder interests in the Residuary Trust. Given respondent's concession, however, any questions we might have about those aspects of Mr. Eckstein's analysis do not matter. Having determined that the conditions on which respondent based his concession have been met, we hold respondent to that concession and find that Linda and Peter each made a gift to Bruce of $35,141,321.

*Decisions will be entered under Rule 155.*